21 F.3d 1431
 UNITED STATES of America, Plaintiff-Appellant,
v.
Christopher Lee ARMSTRONG, aka: Chris Armstrong, Defendant,
and
Robert Rozelle, Aaron Hampton; Freddie Mack; Shelton
Auntwan Martin, Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
Christopher Lee ARMSTRONG, aka: Chris Armstrong, Defendant-Appellee.
 Nos. 93-50031, 93-50057.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 12, 1993.
Decided Jan. 21, 1994.
Opinion Withdrawn April 20, 1994.
Order April 20, 1994.
 
 Lawrence H. Cho and Miriam A. Krinski, Asst. U.S. Attys., Los Angeles, CA, for plaintiff-appellant.
 David Dudley, Los Angeles, CA, for defendant-appellee Armstrong.
 Timothy C. Lannen, Los Angeles, CA, for defendant-appellee Hampton.
 Barbara O'Connor, Deputy Federal Public Defender, Los Angeles, CA, for defendant-appellee Martin.
 Joseph F. Walsh, Los Angeles, CA, for defendant-appellee Rozelle.
 Appeal from the United States District Court for the Central District of California.
 Before: HARLINGTON WOOD, Jr.,* REINHARDT, and RYMER, Circuit Judges.
 ORDER
 The opinion and dissent filed January 21, 1994, slip op. 599, and appearing at 14 F.3d 1387 (9th Cir.1994), are withdrawn. A new opinion and dissent are filed in their place, and the petitions for rehearing and suggestions for rehearing en banc are dismissed as moot without prejudice.
 OPINION
 HARLINGTON WOOD, Jr., Senior Circuit Judge:
 
 
 1
 A federal grand jury indicted defendants Christopher Armstrong, Aaron Hampton, Freddie Mack, Shelton Martin, and Robert Rozelle for conspiring to distribute cocaine base in violation of 21 U.S.C. Sec. 846 (1988). Some of the defendants also were indicted on substantive cocaine base charges under 21 U.S.C. Sec. 841(a)(1) (1988), and using a firearm in connection with drug trafficking under 18 U.S.C. Sec. 924(c) (1988 & Supp. III 1991). The defendants moved for discovery on whether the government selected the defendants for prosecution because of their race, and the district court granted the motion. After denying the government's motion to reconsider, the district court dismissed the indictments as a sanction for failure to comply with the discovery order, but stayed the execution of the dismissals pending appeal by the government.
 
 
 2
 We have jurisdiction to hear the government's appeal from the final judgment of the district court pursuant to 28 U.S.C. Sec. 1291 (1988) and 18 U.S.C. Sec. 3731 (1988). For the reasons stated, we reverse.
 
 I. FACTUAL BACKGROUND
 
 3
 A task force composed of Inglewood Narcotics Division detectives and Bureau of Alcohol, Tobacco, and Firearms (ATF) agents used three confidential informants from February through April of 1992 to infiltrate a cocaine base[1] distribution ring. On seven occasions from February 13, 1992, to April 6, 1992, the informants purchased cocaine base totalling approximately 124.3 grams from the defendants. The informants also reported the use of multiple firearms by the defendants during the sales.
 
 
 4
 On April 8, 1992, task force police executed search warrants on the hotel room in which the informants made their purchases, as well as on residences belonging to some of the defendants. The officers arrested defendants Armstrong and Hampton in the hotel room, discovering 9.29 additional grams of cocaine base and a loaded gun. The officers subsequently arrested defendants Mack, Martin, and Rozelle pursuant to bench warrants the district court issued. Ultimately, the task force police seized multiple firearms and approximately 135 grams of cocaine base as a result of the investigation. All of the defendants are black.
 
 
 5
 The government sought indictments against all defendants in federal court. On April 21, a grand jury indicted all defendants for conspiracy to distribute cocaine base under 21 U.S.C. Sec. 846. The indictment also charged some defendants with substantive cocaine base violations of 21 U.S.C. Sec. 841(a)(1), and usage of a firearm in connection with drug trafficking in violation of 18 U.S.C. Sec. 924(c). The federal statutes at issue provide for more stringent penalties than their California counterparts.[2]
 
 
 6
 On July 20, 1992, defendant Martin filed a Motion for Discovery and/or Dismissal of Indictment for Selective Prosecution, claiming that the government was prosecuting him because of his race. Defendants Armstrong, Mack, Hampton, and Rozelle all timely joined defendant Martin's motion. The district court held a hearing on the motion on September 8, 1992.
 
 
 7
 At the hearing, the defendants offered as evidence of selective enforcement an affidavit from a paralegal employed by the Office of the Federal Public Defender. The affidavit, which included a statement and a chart, asserts that in the 24 cases closed by the Federal Public Defender's Office in 1991 involving cocaine base violations of 21 U.S.C. Sec. 841 and/or 21 U.S.C. Sec. 846, the defendant in each case was black. The defendants for some reason did not offer an affidavit from the Federal Public Defender or any supervising attorney, or for that matter any other evidence at all, but instead relied solely on the affidavit from the paralegal employee. As a result, the government contended that the defendants failed to meet the showing required to compel discovery.
 
 
 8
 Nevertheless, on September 8, 1992, the district court disagreed with the government and granted the motion for discovery on the issue of selective prosecution. The district court ordered the government to: (1) provide a list of all cases from the prior three years in which the government charged both cocaine base offenses and firearms offenses; (2) identify the race of the defendants in those cases; (3) identify whether state, federal, or joint law enforcement authorities investigated each case; and (4) explain the criteria used by the U.S. Attorney's Office for deciding whether to bring cocaine base cases federally.
 
 
 9
 On September 16, 1992, the government filed a motion for reconsideration of the discovery order. In support of its motion for reconsideration, the government submitted sworn declarations of a Special Agent of the Drug Enforcement Administration with 21 years experience, a Special Agent of the Bureau of Alcohol, Tobacco, and Firearms with three years experience at the ATF and another three years as a narcotics officer, a narcotics detective from the Inglewood Police Department with 10 years on the force and three years experience in the narcotics unit, and two experienced Assistant United States Attorneys stating that: (1) the Office of the Federal Public Defender represented at least five non-black cocaine base defendants during the relevant time period; (2) the government prosecuted many non-black cocaine base defendants during 1991, the period at issue in the report prepared by the paralegal employed by the Office of the Federal Public Defender; (3) the county district attorney's offices prosecute many black cocaine base offenders; (4) the government based its decision to charge on the existence of federal firearms and narcotics violations that met the guidelines of the United States Attorney's Office, the strength of the evidence, the deterrence value, the federal interest, the suspects' criminal history, and other race-neutral criteria; and (5) socio-economic factors account for the prevalence of drugs in certain communities, as illustrated by black gangs in the south-central Los Angeles area predominantly controlling the supply of cocaine base.
 
 
 10
 In response to the government's motion for reconsideration, the defendants offered two additional declarations. The first, made by one of the defense attorneys, states that she had spoken with a halfway house intake coordinator who told her that in his experience in treating cocaine base addiction, the number of Caucasian and minority users and dealers is equal. The other declaration, made by another defense attorney, asserts that (1) he has represented only blacks in federal court on cocaine base charges; (2) he has never heard of non-blacks being prosecuted in federal court on cocaine base charges; and (3) in his conversations with unnamed state court judges, prosecutors, and defense attorneys, he has come to believe that the state prosecutes many non-black cocaine base offenders in state court. The defendants also submitted an article from the Los Angeles Times, which contends that blacks disproportionately commit cocaine base offenses. See Jim Newton, Harsher Crack Sentences Criticized as Racial Inequality, Los Angeles Times, Nov. 23, 1992, at A1, A20.
 
 
 11
 After a hearing on the motion for reconsideration, on December 29, 1992, the district court denied the motion. The government notified the district court on January 5, 1993 of its intention to challenge the discovery order and the denial of the reconsideration motion. As a sanction for failure to comply with the order, the district court dismissed the indictments of all defendants. The district court stayed the execution of the dismissals pending this appeal.
 
 II. DISCUSSION
 
 12
 The parties did not discuss the relationship between two decisions of this court published within days of each other, United States v. Redondo-Lemos, 955 F.2d 1296 (9th Cir.1992), which was finalized on May 11, 1992, and United States v. Bourgeois, 964 F.2d 935 (9th Cir.1992), decided on May 19, 1992. Bourgeois and Redondo-Lemos, both thoughtful opinions, examined somewhat differently the process by which defendants can obtain discovery on a claim for selective prosecution.
 
 
 13
 In Redondo-Lemos, the defendant was caught transporting 695 pounds of marijuana into the United States from Mexico. The defendant pled guilty to a violation of 21 U.S.C. Sec. 841(a)(1) in exchange for the government's promise to recommend that the district court impose only the mandatory minimum sentence of five years imprisonment. The district court, without any motion by the defendant, held that the United States Attorney's Office was selectively enforcing the drug laws against male defendants, and sentenced Redondo-Lemos to 18 months imprisonment instead of the 5-year mandatory minimum sentence.
 
 
 14
 On appeal, this court set forth the process for resolving a selective prosecution claim. First, Redondo-Lemos states that "[n]o one is entitled to call the prosecution to answer for a particular charging or plea bargaining decision without making a prima facie showing that wrongful discrimination is taking place." Redondo-Lemos, 955 F.2d at 1302. Redondo-Lemos states that a prima facie showing can be satisfied in one of two ways: (1) if "the district court develops a suspicion of unconstitutional conduct on the basis of its own day-to-day observations," or (2) if the defendant, rather than the district court, is the one to raise the claim of selective prosecution, "he must present enough evidence to demonstrate a reasonable inference of invidious discrimination." Id. Only the suspicion of the district court, however, was at issue or applied in Redondo-Lemos.
 
 
 15
 Second, Redondo-Lemos states that once the prima facie case is established, the Office of the United States Attorney must have an opportunity to rebut the prima facie case. At this stage, the showing that the United States Attorney must make "would not involve file information about specific cases, but [rather would] consist only of overall case statistics." Id. Those overall statistics would be available to both the district court and defense attorneys. Id.
 
 
 16
 Third, if after the district court has seen the rebuttal evidence, the court finds discriminatory impact by a preponderance of the evidence, it then must determine if the prosecutor's charging decision was based on a discriminatory motive. Id. That decision "may, in rare instances, extend to in camera examination of certain prosecution case files and to limited discovery by opposing counsel." Id. In this third stage Redondo-Lemos for the first time raises the possibility of discovery by the defense. If, once the district court examines discriminatory motive and listens to government rebuttal evidence, the court finds by preponderance of the evidence intentional discrimination based on a suspect classification, it may fashion an appropriate remedy. Id.
 
 
 17
 Unlike Redondo-Lemos, Bourgeois confines itself to the question of when a defendant may obtain discovery based on a claim of selective prosecution. At issue in Bourgeois was a 2-day series of firearms arrests known as "Operation Streetsweep." Bourgeois, 964 F.2d at 936. Bourgeois, a felon, was caught in Operation Streetsweep and indicted for possession of a firearm in violation of 18 U.S.C. Sec. 922(g)(1). Id. at 937. Bourgeois moved to dismiss the indictment based on selective prosecution, arguing that he was selected for prosecution because he is black. Id. Bourgeois also filed a discovery request for information regarding the sting operation in which he was arrested. Id. The district court denied the discovery request, and Bourgeois entered a conditional guilty plea. Id.
 
 
 18
 On appeal, this court examined the question of when defendants are entitled to discovery on selective prosecution claims. Bourgeois noted that to be ultimately successful on a selective prosecution claim, a defendant would have to prove "that others similarly situated have not been prosecuted and also that the prosecution is based on an impermissible motive." United States v. Wayte, 710 F.2d 1385, 1387 (9th Cir.1983), quoted in Bourgeois, 964 F.2d at 938. Bourgeois then explained that it was an open question as to whether the standard for obtaining discovery was different from the standard for ultimate success on a selective prosecution claim, and to what degree. Bourgeois, 964 F.2d at 938.
 
 
 19
 The Bourgeois court decided that defendants must satisfy a high threshold to obtain discovery. Id. at 939. The court adopted a high threshold first because "courts are ill equipped to assess a prosecutor's charging decisions," and second because "court oversight of prosecutorial decisions could undermine effective law enforcement." Id. The court sought to "discourage fishing expeditions, protect legitimate prosecutorial discretion, safeguard government investigative records, and yet still allow meritorious claims to proceed." Id. at 940. The standard the court adopted to accomplish these ends was that "to obtain discovery on a selective prosecution claim, a defendant must present specific facts, not mere allegations, which establish a colorable basis for the existence of both discriminatory application of a law and discriminatory intent on the part of the government." Id. at 939. Bourgeois noted that the "colorable basis" standard was meant to continue the trend of the past few decades, during which time only a handful of defendants obtained discovery on a selective prosecution claim. Id. at 940.
 
 
 20
 Thus, the question for us here is whether to apply the Redondo-Lemos "suspicion" test, the Redondo-Lemos "reasonable inference" test, or the Bourgeois "colorable basis" test. In our view, the record does not support the proposition that the district court based its discovery order on its day-to-day observations, and therefore the Redondo-Lemos "suspicion" test is inapplicable. That conclusion is grounded in the district court's reasoning for granting the defendants' request for discovery.
 
 
 21
 The district court, in explaining its decision to order discovery, stated: "The court sees it different than Bourgeois, in that in this case we do have something more than mere allegations." The court thus relied on the reasoning of Bourgeois in analyzing the defendants' evidence, not on its own day-to-day observations. Additionally, the district court noted that at issue is "a fairly general charge--one that we see regularly in this courthouse--and whether it is coincidental or not, that out of the group that the public defender [proffered] all of them happen to be of the same racial group." (Emphasis added.) This further illustrates the district court's reliance on the evidence, not its own suspicions. The fact that the district court specifically expressed no opinion as to whether the racial composition of defendants represented by the Federal Public Defender was a coincidence indicates not suspicion, but rather a lack thereof.
 
 
 22
 The district court concluded that "the number [of black defendants shown by the public defender] is adequate that [it] would at least require the government to provide some explanation. The time period is such that would require some explanation. The charges are the same or similar, and the race is the same in each case." Those comments immediately precede the district court granting the motion for discovery, and are the basis for doing so. The record demonstrates that the district court based its decision on the evidence presented by the defendants, not on its own day-to-day observations. As a result, the Redondo-Lemos "suspicion" test is inapplicable, and we must choose between the Redondo-Lemos "reasonable inference" test and the Bourgeois "colorable basis" test.
 
 
 23
 Although neither phrase is easily susceptible to further definition, we believe that it would be more appropriate to apply the Bourgeois "colorable basis" test in this particular case than the Redondo-Lemos "reasonable inference" test. As previously noted, Redondo-Lemos did not apply the "reasonable inference" test, as the district court initiated the selective prosecution inquiry sua sponte. Additionally, in Redondo-Lemos the defendant was not seeking discovery. Redondo-Lemos, 955 F.2d at 1297. The court simply was attempting to explain the entire process for pursuing a selective prosecution claim, of which discovery is one part. See id. at 1297, 1302. We doubt that the court in Redondo-Lemos intended its discussion to be the final expression of law in discovery cases.
 
 
 24
 Bourgeois, on the other hand, addressed a situation similar to the one here. Bourgeois alleged that he was selected for prosecution based on his race, and filed a discovery request in an attempt to prove his claim. Bourgeois, 964 F.2d at 937. The court squarely confronted the issue of when a defendant is entitled to discovery, and devoted approximately three pages of analysis to that issue alone. See id. at 937-40. The court in Bourgeois analyzed a split in the circuits and supported its decision to apply the "colorable basis" test with policy analysis. Id. When a district court bases its decision on evidence supplied by the parties rather than on its own day-to-day observations, Bourgeois is the law of this circuit regarding the test for determining whether to grant a defendant's motion for discovery on a selective prosecution claim.[3]
 
 
 25
 Having decided that the Bourgeois colorable basis test governs here, we must now apply that test to the facts of this case. The defendants submitted three affidavits and a newspaper article in support of their motion for discovery. The first affidavit, the statement and chart by the paralegal that was the only evidence the defendants initially offered, was that of 24 cocaine base cases closed by the Office of the Federal Public Defender in 1991, all 24 involved black defendants.
 
 
 26
 Taken alone, that evidence does not establish "specific facts, not mere allegations, which establish a colorable basis for the existence of both discriminatory application of a law and discriminatory intent on the part of the government." Bourgeois, 964 F.2d at 939. To demonstrate discriminatory application, a defendant must provide a colorable basis for believing that "others similarly situated have not been prosecuted." Wayte, 710 F.2d at 1387, quoted in Bourgeois, 964 F.2d at 941. The first affidavit demonstrates only that others have been prosecuted, not that others similarly situated have not--obviously, a total lack of evidence cannot constitute a colorable basis for believing that discriminatory application of the law exists.
 
 
 27
 Requiring defendants to provide a colorable basis for believing that others similarly situated have not been prosecuted is a reasonable requirement. "Selective prosecution" implies that a selection has taken place. If a defendant is part of a protected class, that alone does not provide a colorable basis for believing that a selection has taken place; nor does evidence demonstrating that other members of the protected class were prosecuted provide a colorable basis for so believing. Rather, a defendant must supply a colorable basis for believing that others similar to him except that they are not in his protected class were not prosecuted. Without a colorable basis to believe that others similarly situated were not prosecuted, the most reasonable conclusion is that the defendant was selected for prosecution because the government believed the defendant committed the offense; the fact that the defendant is a member of a protected class is coincidental.
 
 
 28
 The evidence that all 24 cocaine base cases closed in 1991 by the Federal Public Defender involved black defendants is insufficient to provide a colorable basis to believe selection took place. The statistic in question does not speak to whether the Federal Public Defender had other cases involving white defendants that did not close during that period. Additionally, there is no information on whether any of the defendants in the 24 cases were similarly situated to the defendants in this case. The government claims it selected the defendants for prosecution in this case because they committed cocaine base offenses while possessing firearms. If none of the 24 cases handled by the public defender involved firearms, the statistic is of little meaning, particularly in light of the government's explanation. As a final criticism, the statistic tells us nothing of the racial composition of defendants charged with drug trafficking who may have had sufficient resources to retain their own attorneys.
 
 
 29
 The defendants contend, however, that the statistic is meaningful in light of the newspaper article and two affidavits supplied in opposition to the government's motion for reconsideration. The article, from the Los Angeles Times, states that white cocaine offenders are being punished less severely because whites predominantly violate powder cocaine laws, while blacks predominantly violate crack cocaine laws, the latter of which carry longer sentences than the former. See Jim Newton, Harsher Crack Sentences Criticized as Racial Inequality, Los Angeles Times, Nov. 23, 1992, at A1, A20. We agree with the district court's determination that nothing in the article supports the defendants' position; indeed, the article arguable cuts the other way. Perhaps the defendants were alluding to an argument that the federal sentencing scheme violates equal protection because of this disparity, but because they did not actually make the argument, we express no opinion on that matter here. Any fault in this regard, if fault indeed exists, does not lie with the United States Attorney, for the United States Attorney plays no role in drafting the United States Sentencing Guidelines.
 
 
 30
 The two additional affidavits, although not harmful to the defendants' position like the newspaper article arguably is, are not helpful either. One of the affidavits, made by an attorney for one of the defendants, states merely that an intake coordinator at a Pasadena halfway house had told the defense attorney that "it was his experience in dealing with the treatment of cocaine base addiction, that there are an equal number of Caucasian users and dealers to minority users and dealers." This statement is: (1) hearsay--the defendants certainly could have gotten an affidavit from the intake coordinator himself; (2) unsubstantiated; (3) without any indication of sample size, duration, or methodology of any kind; (4) without an indication of whether the magnitude of the sales is similar to those of the defendants in this case; (5) based on "users and dealers" rather than dealers who possess firearms; and (6) based on users and dealers being treated for addiction, without any evidence that such a sample is representative of dealers as a whole. The district court erred in placing any weight on such flimsy evidence.
 
 
 31
 The other affidavit, made by another attorney for the defense, states that "I talk to many state court judges, prosecutors, and defense attorneys ... [and] [t]here are many crack cocaine sales cases prosecuted in state court that do involve racial groups other than blacks. A major percentage of sales of crack cocaine cases are prosecuted against Latinos in the state courts." This statement: (1) is hearsay--there are no affidavits from any of the unnamed purported sources of this information; (2) fails to indicate whether the magnitude of the sales is similar to those of the defendants in this case; (3) does not include any information about cocaine base offenses involving the possession of firearms; and (4) gives no statistics, but rather merely reports the defense attorney's personal conclusions that there are "many" cases and that there is a "major" percentage. These are hardly the "specific facts, not mere allegations, which establish a colorable basis for the existence of ... discriminatory application of a law" envisioned by Bourgeois. Bourgeois, 964 F.2d at 939.
 
 
 32
 Given that the ineffective affidavits and arguably damaging article, even taken together, did not contradict the government's explanation for its decision to prosecute, we must conclude that the district court abused its discretion in concluding that the defendants' evidence provided a colorable basis to believe that discriminatory application of a law existed. Bourgeois, as previously explained, set a high threshold for obtaining discovery, and expressed very sound policy rationales for doing so. See id. at 939-40. Had the district court viewed the defendants' evidence in light of the reasoning of Bourgeois, it should have concluded that the evidence failed to establish a colorable basis for believing that the government was engaging in selective prosecution.
 
 
 33
 As a final matter, one could argue that Bourgeois should be distinguished based on the duration of the government operations involved in each case. In Bourgeois, a 2-day operation was at issue, id. at 936, and in the instant case the defendants proffered a 2-month "study" by the Office of the Federal Public Defender. That distinction, by the very language of Bourgeois, is unimportant in this case.
 
 
 34
 The court in Bourgeois found that Bourgeois had failed to establish a colorable basis that others similarly situated had not been prosecuted. Id. at 941. It did this because "Bourgeois [made] no attempt to show that, in any span of time, the government has declined to prosecute similarly situated, non-black felons illegally in possession of firearms." Id. (emphasis added). Thus, the court explained that regardless of the duration of the operation in question, defendants attempting to obtain discovery on a claim of selective enforcement must provide a colorable basis for believing that similarly situated felons not in their protected class were passed over for prosecution. The evidence in this case was unsatisfactory for the very same reason, and the duration of the operations in each case therefore is irrelevant.
 
 III. CONCLUSION
 
 35
 The district court erred in finding that the evidence the defendants presented in this case established a colorable basis for believing that the government engaged in selective prosecution. The defendants' evidence, which likely would be inadmissible in other contexts, was tenuous at best, and in one case even arguably was counterproductive. If more than this quantum of evidence is not required, district courts too often and unnecessarily could become immersed in the workings of a coordinate branch of government, to the benefit of neither. Accepting the defendants' weak evidence and disregarding the sworn declarations of experienced federal agents and two Assistant United States Attorneys that explained and refuted the defendants' statistics was error, and for that reason the decision of the district court dismissing the indictments is
 
 
 36
 REVERSED.
 
 REINHARDT, Circuit Judge, dissenting:
 
 37
 Rozelle and Armstrong, two black criminal defendants, present one of the most serious claims any person can raise--that the government has engaged in racial discrimination in selecting which offenders to prosecute. Such a claim deserves the most careful examination, for the ability to decide whether to bring charges gives prosecutors an awesome power to affect people's lives. When prosecutors use this power in a racially discriminatory manner, courts must step in to protect the objects of that conduct. Moreover, when one of our experienced district judges finds credible evidence that federal prosecutors are engaging in such impermissible discrimination, we should be most hesitant to prevent her from gathering further information that will permit a full examination of the claim. Yet the majority here abruptly cuts off exploration of the explosive charge made by these two defendants, concluding, surprisingly, that Judge Marshall abused her discretion in ordering further discovery. I disagree strongly with my colleagues' decision. The defendants have shown far more than a "colorable basis" for a belief that the practice of racially discriminatory prosecution exists. Moreover, the district judge's own observations and experience with the United States Attorney's office provide substantial additional support for the discovery order. For these reasons, and because recent studies indicate that further discovery might conclusively prove that prosecutors have engaged in unconstitutional conduct, I dissent.
 
 I.
 
 38
 At the outset, it is important to make plain the narrow scope of our review, a scope which the majority clearly exceeds. First, we are reviewing only the district court's discovery order. The district court has not decided that the defendants have shown unconstitutional selective prosecution, and the defendants do not have to prove impermissible discrimination to obtain discovery. If they could make such a showing without any discovery, there would be no need for discovery in the first place. Because we review only the district court's decision to allow the defendants to gather more evidence, it is not our job to decide whether the defendants have made an ultimate showing of unconstitutional discrimination. Their burden in cases of this nature is far less.
 
 
 39
 Second, we review the district court's decision to order discovery for abuse of discretion. United States v. Bourgeois, 964 F.2d 935, 937 (9th Cir.1992). "The task of safeguarding the rights of criminal defendants ultimately rests with the experienced men and women who preside in our district courts." United States v. Balough, 820 F.2d 1485, 1491 (9th Cir.1987). District judges are uniquely situated to observe possible discrimination in the government's charging decisions. They have much more experience with the policies and practices of the United States Attorney in their district than do we, and they are obviously in a better position to observe a pattern of discrimination than are individual defendants. See United States v. Redondo-Lemos, 955 F.2d 1296, 1298, 1302 (9th Cir.1992). Accordingly, when a district court, knowledgeable of the practices and performance of a particular United States Attorney's office, finds a defendant's showing of selective prosecution sufficiently persuasive to warrant further inquiry, we should only overturn its decision based on a very clear showing of error. Were my colleagues to afford the district court's determination the deference to which it is entitled, they would have no choice but to affirm.
 
 II.
 A.
 
 40
 The effect of the majority's decision is to create three highly artificial categories of cases. At one extreme are the cases in which a district judge completely ignores his or her own experience and observations and makes clear on the record that the discovery order is based solely on the submissions of the parties. Under the majority's opinion, this category of cases is governed by the Bourgeois standard, and the evidence submitted by the parties must create a "colorable basis" for the discovery order.[1] At the other extreme are those cases in which, as in Redondo-Lemos, a district judge develops a suspicion of discriminatory conduct based purely on his own day-to-day observations and orders discovery or a hearing without any prompting by the parties. In this category of cases, the "suspicion" rule set forth in Redondo-Lemos requires a reviewing court to defer to the district judge's determinations.
 
 
 41
 In between these extremes lie the cases which surely arise most frequently--those in which a district judge's decision to order discovery is based in part on the evidence submitted by the parties and in part on his own personal experience, observations, and suspicions. Although in its opinion the majority, remarkably, does not acknowledge the existence of this category and thus does not discuss the standard to be applied in mixed-basis cases, it is clear that, whether these cases are viewed through the framework provided by Redondo-Lemos or that provided by Bourgeois, an appellate court should overturn a district court's order permitting discovery in such cases in only the rarest of circumstances. When the evidence presented by a defendant, combined with a district judge's own observations, convinces the judge that further inquiry is warranted, it should ordinarily be enough to satisfy any of the standards we have enunciated.
 
 B.
 
 42
 The majority's decision to reverse the district judge is based on its conclusion that this case falls into the first of the three categories--that the record makes clear that Judge Marshall deliberately put aside her day-to-day observations and experience with the United States Attorney's office and based her decision solely on the parties' submissions. My colleagues conclude that in this case the district judge relied in no part on her own observations: "The record demonstrates that the district court based its decision on the evidence presented by the defendants, not on its own day to day observations." Ante at 1435-36. My colleagues appear to concede that when "the district court develops a suspicion of unconstitutional conduct on the basis of its own day-to-day observations, this will be deemed a sufficient prima facie showing" to support a further inquiry by the district court, including limited discovery. Redondo-Lemos, 955 F.2d at 1302. However, instead of treating this as a mixed-basis case, in which a district court's review of the evidence, augmented by its experience with the particular prosecutor's office, is entitled to substantial deference, the majority looks only at the evidence presented by the defendants. My colleagues then hold that the defendants' submissions fail to meet the Bourgeois standards for discovery.
 
 C.
 
 43
 I have three objections to the majority's decision. First, as I have suggested, I believe that its creation of three arbitrary categories unnecessarily and improperly complicates this area of the law. Discovery orders in discriminatory prosecution cases should be judged by a single standard, one that draws on the principles enunciated in both Redondo-Lemos and Bourgeois. This standard should be appropriate for use in the vast majority of cases--those in which the district judge makes a decision to order discovery based in part on the evidence submitted by the parties and in part on his own observations and experience. It should apply uniformly, regardless of whether the district court relies only slightly on the evidence presented by the parties and most substantially on his own experience, or vice versa, or even if the district court disclaims any knowledge of the general subject. In any event, the standard should require reversal of an order permitting discovery only when, giving substantial weight to the district court's own observations, the court could not rationally have reached the judgment it did.
 
 
 44
 Even assuming the majority's three-tiered approach is coherent or sensible, I disagree strongly with its decision to place this case in the first category--to classify it as a case in which the district court ignored its own experience and relied solely on the evidence presented by the parties. A fair view of the record demonstrates to me that Judge Marshall's decision to order discovery was based at least in part on her own observations of and experience with the United States Attorney's office.[2] If my colleagues were to consider that factor in combination with the evidentiary showing they reject, they would surely be required to uphold the district court's order. Thus, on remand Judge Marshall will be free to issue a new discovery order if she bases that new order in part upon her own day-to-day experience.
 
 
 45
 Finally, I believe that the defendants have made a sufficient evidentiary showing, wholly apart from the district judge's observations, to support the discovery order previously issued. Thus, even if I agreed with the majority that the district court entirely ignored its day-to-day observations and focused solely on the parties' evidentiary submissions, I would still affirm under the Bourgeois standard. I explain why below.
 
 III.
 
 46
 The Bourgeois standard is not as difficult to meet as the majority's conclusion in this case might lead one to believe. Because we thought that a "nonfrivolousness" standard would allow a defendant too easily to delay a prosecution and initiate intrusive discovery, and that a "prima facie case" standard would often make it impossible for defendants with legitimate claims to obtain the evidence necessary to support them, we sought a middle ground in Bourgeois. See Bourgeois, 964 F.2d at 938-39. We settled on a "colorable basis" standard:
 
 
 47
 [T]o obtain discovery on a selective prosecution claim, a defendant must present specific facts, not mere allegations, which establish a colorable basis of both discriminatory application of a law and discriminatory intent on the part of government actors.
 
 
 48
 Id. at 939.
 
 
 49
 Although we described the Bourgeois standard as establishing a "high threshold," id., it is clear that under that test a defendant need not come anywhere close to proving a claim of selective prosecution in order to obtain discovery. Indeed, the defendant need not even present a prima facie case. The defendant instead need only present "some evidence tending to show the essential elements of the claim." United States v. Heidecke, 900 F.2d 1155, 1159 (7th Cir.1990) (discussing "colorable basis" standard). While a defendant will not satisfy his burden by merely presenting unsubstantiated or generalized allegations, he is entitled to discovery if he can show some specific facts which raise an inference of impermissible discrimination.[3]
 
 
 50
 Under the Bourgeois standard, the defendants have presented more than enough evidence to raise a sufficient inference of discrimination to warrant discovery. In particular, the study conducted by the Office of the Federal Public Defender raises a strong inference of invidious discrimination. This study found that, of all cocaine base cases closed by the Office in 1991, 24 out of 24 involved black defendants. To be sure, such a small sample does not conclusively establish either of the elements of selective prosecution. However, the fact that every single crack defendant represented by the Federal Public Defender in a case that terminated during 1991 was black certainly raises enough of a question to justify further inquiry by the court.
 
 
 51
 The evidence supporting an inference of discriminatory prosecution in this case is much stronger than the evidence we held insufficient to justify discovery in Bourgeois. In that case, the defendants argued that they were entitled to discovery based on a showing that all prosecutions for firearms violations stemming from a two-day police operation involved black defendants. The district court rejected the defendants' claims, holding that two days was far too short a period to serve as a basis for analyzing the overall conduct of a prosecutorial agency. Instead of focusing on the single operation which resulted in the arrests of Bourgeois and his associates, the district court looked instead to all firearms prosecutions over a two-year span. The court found that the government had prosecuted over 140 people during that period for the same crimes as those for which Bourgeois was prosecuted. Because Bourgeois "did not allege that all or most of these cases involved blacks," Bourgeois, 964 F.2d at 940, the district court concluded that he had not established a colorable basis to justify discovery. We held that the district court did not abuse its discretion in refusing to order discovery in these circumstances. See id. at 941.[4]
 
 
 52
 The evidence offered in Bourgeois involved only one operation, over a single two-day period. The Federal Public Defender study, by contrast, involved an agency that represents a significant percentage of all federal criminal defendants, and it involved all cases closed over a significant period of time. Common sense indicates that the inference of discrimination one can reasonably draw from such a study is much stronger than the inference one can draw from evidence involving only a single, short police operation. See id. at 941 ("[T]he relevant inquiry is the history of prosecutions over a reasonable period of time."). The study showed that the largest single provider of legal services to federal criminal defendants in the Central District of California did not conclude a single crack defense of a non-black defendant in all of 1991. Although the sample size is too small to resolve the issue either way, this evidence certainly raises a serious question whether the government is intentionally discriminating against blacks. I do not see how the majority can conclude that it was an abuse of discretion for the district court to allow the defendants to inquire further into the issue.
 
 
 53
 The majority concludes that the Federal Public Defender study is insufficient to warrant discovery because it "demonstrates only that others have been prosecuted, not that others similarly situated have not." Ante at 1436. Yet even by the majority's own standard a defendant is not required to demonstrate that the government has failed to prosecute others who are similarly situated. He need only "provide a colorable basis for believing that others similarly situated have not been prosecuted." Ante at 1436 (emphasis added). The study introduced by the defendants clearly satisfies this requirement. Given the prevalence of all kinds of drugs throughout our community, at least some crack distributors must be non-blacks. The fact that the Office of the Federal Public Defender had not closed a case involving a single non-black defendant in an entire year provides at least a colorable basis to believe that some non-black offenders existed whom the United States Attorney failed to prosecute.
 
 
 54
 When a defendant presents statistics tending to show that all prosecutions over a significant period of time are directed at members of a single race, such a presentation alone should raise sufficient suspicion to warrant a further inquiry. On closer scrutiny, we may discover that the statistics can be explained by methodological defects, such as an inadequate sample size or an insufficient time-frame. However, one fact we most assuredly will never find. If our method of analysis is at all fair or rational, we will not discover that it is only members of the defendant's race who commit the crime in question.
 
 
 55
 Contrary to the majority's view, we must assume, what is unquestionably the case, that people of all races commit all types of crimes. Under no circumstances can we base our analysis on the premise that any type of crime may be the exclusive province of any particular racial or ethnic group. Yet that is precisely what the majority does. Even if the defendants made a conclusive showing that the government had only prosecuted members of a single race for a particular class of crime, the majority would apparently conclude that they had failed to meet their burden. My colleagues would apparently require the defendants to present affirmative evidence showing that similarly situated potential defendants of other races existed--in other words that whites and browns also commit violations of 21 U.S.C. Secs. 841 and 846. See ante at 1436 ("The first affidavit demonstrates only that others have been prosecuted, not that others similarly situated have not--obviously, a total lack of evidence cannot constitute a colorable basis for believing that discriminatory application of the law exists."). Unless we make the unsupportable assumption that there is a reasonable possibility that only blacks commit the crimes with which the defendants are charged, the majority's analysis is manifestly erroneous. If the United States Attorney's office prosecutes only members of a particular race, simple logic and common sense tell us that it is failing to prosecute at least some similarly-situated members of other races. Where a defendant shows a reasonable statistical basis for the inference that all defendants charged with a particular federal crime over a significant period of time were members of a single race, such a showing creates, ipso facto, a colorable basis for believing that similarly situated members of other races were not prosecuted. Therefore, there is no legal basis whatsoever for requiring the defendant to point to particular cases in which the government failed to prosecute similarly-situated members of other races.
 
 
 56
 The majority rightly notes that the Federal Public Defender study does not in itself establish that the United States Attorney has engaged in selective prosecution. It is true that the study refers only to cases closed in 1991 and that it fails to provide more detailed information regarding the specifics of the offenses the other defendants allegedly committed. It is also true that the study does not disclose whether any non-black defendants existed who could afford to hire their own attorneys. See Ante at 1436-37. While these aspects of the study render it insufficient to support an ultimate showing of unconstitutional selective prosecution, the facts set forth are nonetheless more than enough to support a finding of a colorable basis for the claim that discrimination exists. Despite the limitations in the study's methodology, it is sufficient to lead a reasonable person to believe that the United States Attorney might be engaging in discrimination and that further inquiry on the subject is warranted. That is precisely the course the district court took here, and I do not believe that it abused its discretion in doing so.
 
 
 57
 Although the Federal Public Defender study should have been enough to create a colorable basis, the defendants here did provide additional evidence that the federal government failed to prosecute similarly-situated non-black defendants. On the government's motion for reconsideration, the defendants introduced two affidavits from different defense attorneys. One related a statement made by an intake coordinator at a Pasadena halfway house who said that, in his experience, there were an equal number of white and non-white users and dealers of crack. The other affidavit came from David R. Reed, an experienced criminal defense attorney in the Central District. Reed stated that, in his experience as a federal criminal defense lawyer and as a director of the state court indigent defense panel, he had never handled, known of, or heard of a single federal crack cocaine case involving non-black defendants, but that he knew of many crack cocaine cases prosecuted against non-blacks in state court.
 
 
 58
 My colleagues wholly discount these affidavits. Their analysis is flawed in two separate respects, however. First, they seem to believe that the affidavits must be considered in isolation, rather than in light of the Federal Public Defender Study. They criticize the district court for "placing any weight" on the first affidavit, ante at 1437-38, and they state that the second affidavit failed to contain "the 'specific facts, not mere allegations, which establish a colorable basis for the existence of ... discriminatory application of a law.' " Ante at 1437-38 (quoting Bourgeois, 964 F.2d at 939). Whether or not it would have been appropriate for the district court to place any weight on the declarations if they stood alone, they surely satisfy the defendants' burden when considered in light of the study's finding that all federal crack defendants were black. When all of this evidence is taken together, the defendants have established several "specific facts, not mere allegations, which establish a colorable basis" to believe that the government has engaged in selective prosecution: (1) in all crack cocaine cases closed by the Federal Public Defender's Office in 1991, not a single case involved a non-black defendant; (2) an individual with professional experience in treating cocaine base addicts was of the opinion that minorities and non-minorities used and dealt crack in roughly equal numbers; (3) a criminal defense lawyer experienced in defending individuals in federal court, and overseeing indigent defense in state court, had knowledge of many non-black crack offenders who were prosecuted in state court, but none who were prosecuted in federal court.
 
 
 59
 Second, the majority appears to ignore the fact that the defendants are only seeking discovery on their selective prosecution claim. The defendant's burden in seeking discovery is obviously significantly less than the defendant's ultimate burden of proving that the government engaged in discriminatory prosecution. Under Bourgeois, a defendant need not even present a prima facie case in order to obtain discovery, only a colorable basis. See Bourgeois, 964 F.2d at 939. There is no reason to require the defendant to produce admissible evidence in making such a showing.[5] In other contexts in which a party bears a lighter burden of proof than a preponderance of the evidence, the law has held that the lesser quantum of evidence required also entails looser requirements regarding the admissibility of that evidence. See, e.g., Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (grand jury); United States v. One 56-Foot Motor Yacht Named the Tahuna, 702 F.2d 1276, 1283 (9th Cir.1983) (probable cause for forfeiture); Fed.R.Crim.P. 5.1(a) (preliminary probable cause hearing). That rule is applicable here as well. The majority thus errs in dismissing the declarations as hearsay.
 
 
 60
 The majority also errs by appearing to require the defendants to substantiate their claims more fully at this stage of the proceedings than is necessary under Bourgeois. In order to obtain discovery, defendants should not be required to present sophisticated regression analyses closely following the dictates of the scientific method. Nor should they be required to compile facts which are not readily available to them, such as the racial breakdown and offense characteristics of defendants represented by other counsel. Instead, they should only be required to show that specific facts raise a strong inference of impermissible discrimination, and they should only be expected to use whatever evidence is within their possession or reasonably obtainable. The defendants here have satisfied that burden.[6]
 
 IV.
 
 61
 As I explained above, the majority's opinion leaves Judge Marshall free on remand to impose the same discovery order as she had before, so long as she explains that she is basing her order in part on her personal observations of and experience with the United States Attorney's office. In addition, even disregarding that factor, it appears that a sufficient factual basis now exists to satisfy even the majority's overly restrictive application of our standards. A study by Richard Berk of the Center for the Study of the Environment and Society of the University of California at Los Angeles demonstrates that the United States Attorney has failed to prosecute similarly situated white offenders. See Richard Berk and Alec Campbell, Preliminary Data on Race and Crack Charging Practices in Los Angeles, 6 Fed.Sentencing Rep. 36 (1993). Although this study was not before the district court, and thus is not part of the record we review, it provides further indication that the majority has erred in disregarding the evidence that is before it and in overturning the district court's order.[7] If the defendants renew their motion on remand and introduce this study as evidence, the district court would clearly be justified--even without considering its own experience--in reinstating the discovery order.
 
 
 62
 The Berk study analyzed both state and federal data concerning crack cocaine offenses in the Los Angeles area. Specifically, it analyzed all arrests for sale of cocaine base within Los Angeles County between January 1, 1990 and October 10, 1992, all cases referred to the Los Angeles County District Attorney for sale of cocaine base between January 1, 1990 and August 11, 1992, and all sale of cocaine base cases prosecuted by the United States Attorney for the Central District of California between 1988 and 1992. See id. at 36.
 
 
 63
 Analyzing these data, the Berk study reached some alarming conclusions, which are consistent with the defendants' position here.[8] Like the Federal Public Defender study, the Berk study found that, over a nearly two-year period, the United States Attorney did not charge even a single white person with sale of crack cocaine. By analyzing state data, however, the Berk study also refuted the majority's implicit assumption that non-blacks simply do not commit these crimes. Indeed, the data showed that the Los Angeles County District Attorney charged over two hundred whites with sale of cocaine base during this period.
 
 
 64
 The Berk study's conclusions strongly suggest that the United States Attorney's office has engaged in discriminatory prosecution. Although only 58 per cent of the arrests in Los Angeles County for sale of crack during the study's time period involved blacks, and only 53 per cent of crack sale charges by the Los Angeles County District Attorney involved black defendants, the United States Attorney targeted black defendants a full 83 per cent of the time. The disparity between the state and federal figures would seem to necessitate a further investigation of the reasons for the differing actions by the two prosecutorial agencies. In conducting his study, Professor Berk performed chi-squared tests to determine whether the results of his statistical survey could be attributed to chance rather than discrimination. He found that "[f]or the federal data, the chances are less than 1 in 100 (p-value = .0088) that they are just a 'luck of the draw' sample for the population of people arrested." Id. at 38.
 
 
 65
 The Berk study, as well as the data proffered by the defendants in this case, is sufficient to raise a serious question about whether the United States Attorney's office is treating all of the people it serves equally. In particular, it raises the question of whether the United States Attorney reserves the ten-year federal mandatory minimum sentences for black defendants, while allowing non-black defendants to receive three, four, or five year sentences in state court. We cannot tolerate basing the length of a sentence on the color of a defendant's skin. Where there is a colorable showing that this may be occurring, an inquiry is required.
 
 V.
 
 66
 As a practical matter, as I have pointed out, the majority's opinion will have little or no effect on the further proceedings in the district court. The Berk study, which was not before the court when it made its discovery order here, will certainly provide enough of an additional "colorable basis" to support discovery if and when the defendants file a renewed or amended motion following remand. So, too, will the personal knowledge and experience that the majority finds Judge Marshall failed to avail herself of the first time.
 
 
 67
 Nonetheless, it is most unfortunate that the majority overrules Judge Marshall's considered attempt to gain more information about the United States Attorney's charging practices. The five to seven year difference between state and federal sentences for crack sale offenses is not merely academic--five years is a long time to spend in prison. As long as this disparity exists, federal courts have an obligation to make sure that the United States Attorney is treating all members of the community fairly and equally.
 
 
 68
 Judge Marshall's actions showed the judiciary at its best. Unlike the majority, I would not be so quick to overrule her attempt to explore this critical issue and to get more objective information before the court. Certainly, there is no basis whatsoever for concluding that Judge Marshall abused her discretion in trying to do so and in determining that the defendants made a colorable showing of discriminatory enforcement of the law.
 
 
 69
 Judge Marshall acted properly by ordering discovery with respect to this issue. I would affirm.
 
 
 
 *
 Honorable Harlington Wood, Jr., Senior United States Circuit Judge, Seventh Circuit Court of Appeals, sitting by designation
 
 
 [1]
 Cocaine base is known more commonly as "crack" cocaine
 
 
 [2]
 Under 21 U.S.C. Sec. 841(b) (1988 & Supp. III 1991), persons selling 50 grams or more of a mixture or substance containing cocaine base in violation of 21 U.S.C. Sec. 841(a) must be imprisoned for at least 10 years and no more than life. Conspiracy, governed by 21 U.S.C. Sec. 846, imposes the same penalty range as the Sec. 841(a) violation. 18 U.S.C. Sec. 924(c) imposes an additional, consecutive 5-year sentence without parole for the usage or carrying of a firearm during and in relation to any drug trafficking crime, as well as mandating longer sentences for repeat violations and more dangerous weaponry. California law, on the other hand, provides for a 3, 4, or 5-year sentence for cocaine base offenders, Cal.Health & Safety Code Sec. 11351.5 (Deering 1993), and if firearms are involved, also provides for a 2, 3, or 4-year sentence, id. Sec. 11370.1
 
 
 [3]
 For the reasons discussed infra, we believe that the evidence proffered by the defendants would fail to meet any reasonable formulation of the test for obtaining discovery as enunciated in either case
 
 
 [1]
 Unlike the majority, I see no practical difference between Bourgeois 's "colorable basis" test and the "reasonable inference" test which Redondo-Lemos requires be used when a party offers evidence tending to establish selective prosecution. There is nothing in these phrases or in the courts' analysis in Bourgeois and Redondo-Lemos to suggest any difference between these standards. (Nor, incidentally, does the majority explain how they differ)
 I note that the majority's recitation of the framework set forth in Redondo-Lemos is somewhat misleading. The majority states that Redondo-Lemos does not "raise[ ] the possibility of discovery by the defense" until after the defendant has presented evidence creating a "reasonable inference" of discrimination and the prosecution has had an opportunity to rebut this showing. Ante at 1435. The majority ignores footnote 12 of Redondo-Lemos, which clearly contemplates "limited discovery in appropriate circumstances prior to the prosecutor's evidentiary presentation." Redondo-Lemos, 955 F.2d at 1302 n. 12.
 
 
 [2]
 For example, in ordering discovery, the district judge stated:
 That is the problem I think that needs to be addressed, because we do see a lot of the cases and one does ask why some are in state court and some are being prosecuted in Federal court, and if it's not based on race what's it based on?
 
 
 [3]
 Thus, the Bourgeois court's prediction that only a small number of defendants would be able to make a sufficient showing to obtain discovery was just that--a prediction. It provides no basis for artificially raising the standard which defendants must meet in order to gather more information on their discriminatory prosecution claims
 
 
 [4]
 By lifting a sentence out of context and then misreading it, the majority unintentionally distorts our decision in Bourgeois. The majority states:
 The court in Bourgeois found that Bourgeois had failed to establish a colorable basis that others similarly situated had not been prosecuted. It did this because "Bourgeois [made] no attempt to show that, in any span of time, the government has declined to prosecute similarly situated, non-black felons illegally in possession of firearms." Thus, the court explained that regardless of the duration of the operation in question, defendants attempting to obtain discovery on a claim of selective enforcement must provide a colorable basis for believing that similarly situated felons not in their protected class were passed over for prosecution. The evidence in this case was unsatisfactory for the very same reason, and the duration of the operation in each case therefore irrelevant.
 Ante at 1438 (citations omitted) (emphasis in majority opinion).
 Contrary to the majority's understanding, the issue in Bourgeois was precisely whether the defendants had shown discrimination over a sufficient period of time. The Bourgeois court assumed that, during the two-day period in question, the government had prosecuted only blacks and had failed to prosecute similarly situated non-blacks. However, it held that a two-day focus was too narrow: "The government need not provide discovery on a selective prosecution claim simply because law enforcement officials focused for a short time on a racially homogeneous criminal group." Bourgeois, 964 F.2d at 940-41. The sentence immediately preceding the one the majority selectively quotes states that "[a]s discussed above, the relevant inquiry is the history of prosecutions over a reasonable period of time." Id. at 941. In this context, the Bourgeois court's statement that "Bourgeois makes no attempt to show that, in any span of time, the government has failed to prosecute similarly situated, non-black felons illegally in possession of firearms" simply refers to the defendants' failure to make a showing of discrimination across a "span of time."
 
 
 [5]
 I should emphasize that the Federal Public Defender study was clearly admissible, and, in my view, it was sufficient in itself to create a colorable basis. The majority only challenges the admissibility of the two declarations. In this connection, I should note that any objection as to admissibility must be raised in the district court and that no such objection was made here
 
 
 [6]
 I should note that nearly all of the data necessary to a showing of selective prosecution are far less accessible to the defendants than to the federal government. Federal and county law enforcement authorities cooperate closely in these cases, and both levels of government are involved in the decision whether to bring charges in federal or state court. The Assistant United States Attorney admitted as much before the district court. He stated that many cocaine base cases were investigated as part of a joint federal/state task force involving local police departments and the federal Bureau of Alcohol, Tobacco, and Firearms. Given that the federal and local authorities work so closely in investigating these crimes, the federal government probably already has records of the cases in which it declined to initiate a federal prosecution. In any event, it is surely much easier for the United States Attorney's office to get this information from state officials, from the county prosecutor's offices, and from local police departments than it is for criminal defense lawyers. Federal, state, and local law enforcement authorities have a cooperative relationship; prosecutors and defense lawyers have an adversarial relationship. Especially since the pertinent records relating to cases in the geographical area covered by the Central District may well be scattered across seven different county district attorney's offices, seven separate sheriff's departments, and a large number of independent local police departments, the defendants would have an almost impossible time compiling data on their own
 
 
 [7]
 We may take judicial notice of this published study on appeal. See Brown v. Board of Education, 347 U.S. 483, 494 n. 11, 74 S.Ct. 686, 692 n. 11, 98 L.Ed. 873 (1954); Swan v. Peterson, 6 F.3d 1373 n. 9 (9th Cir.1993)
 
 
 [8]
 The statistical conclusions of the Berk study are summarized on page 37